Filed 2/25/25  In re D.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.L. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E084292 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1900326) |
| v. | OPINION |
| L.M. ET AL., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge.

Affirmed in part; conditionally reversed and remanded with directions in part.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for

Defendant and Appellant L.M.

Jill Smith, under appointment by the Court of Appeal, for Defendant and

Appellant M.L.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsels, for Plaintiff and Respondent.

I.

INTRODUCTION

L.M. (Mother) and M.L. (Father) appeal from the juvenile court's order terminating parental rights as to their six-year-old son Dev.L. (Dev.), five-year-old son Dem.L. (Dem.) and four-year-old daughter L.L. (Welf. & Inst. Code,[1] § 366.26.) They contend the juvenile court erred in finding the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i) did not apply. (See *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).) Father also argues that the juvenile court and the Riverside County Department of Public Social Services (DPSS) failed to comply with the duty of inquiry under the Indian Child Welfare Act of 1978 (ICWA)[2] (25 U.S.C. § 1901 et seq.) and related state law. Mother joins in Father's argument.[3] We find the juvenile court did not err in finding the parental benefit exception did not apply. However, we conditionally reverse the order terminating parental rights and remand this matter to the juvenile court to comply with the duty of inquiry under subdivision (b) of section 224.2.

---

[1] All future statutory references are to the Welfare and Institutions Code.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1, overruled on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18. (*Dezi C.*).)

[3] Mother's older children (Da.C. and Do.C.) with a different father (D.C.) are not subjects of this appeal.

II.

FACTUAL AND PROCEDURAL BACKGROUND[4]

A. *Initial Petition*

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on June 11, 2019, after an immediate response referral was received with allegations of physical abuse to then one-month old Dem. Mother and Father had brought Dem. to a hospital because the infant was vomiting, lethargic, and had a seizure. The referral noted "'the ophthalmology department found hemorrhages in his eyes, which was reported as an indicator for Shaken Baby Syndrome. . . . Both parents denied any falls or head trauma for Dem[.]'" (*L.M. I.*, *supra*, E080657.)

The social worker attempted to contact the parents but was unsuccessful. The social worker eventually contacted Mother on June 14, 2019 with the assistance of law enforcement at the hospital. Mother did not know where the fathers or the other children were. She denied any head trauma to Dem. or any accident in which he may have fallen, but noted that he had a traumatic birth with the umbilical cord wrapped around his neck twice. Dem.'s treating doctor indicated that Dem.'s bleeding in the eyes and the fluid in his brain were "'"high indicators of shaken baby."'" (*L.M. I.*, *supra*, E080657.) The doctor also stated Dem. still had fluid on his brain that was being drained and that there

---

[4] Unless otherwise indicated, the factual background up until the denial of reunification services is taken from this court's prior nonpublished opinion from the parents' writ petitions, case No. E080657. (*L.M. v. Superior Court* (June 9, 2023, E080657) [nonpub. opn.] (*L.M. I*).) The record from case No. E080657 is incorporated with this current appeal, and the clerk's transcript will be referred to as "WCT."

3

were no skull fractures or other fractures. Dem. was diagnosed with subdural hematoma and retinal hemorrhages with concerns for Shaken Baby Syndrome. (*Ibid*.)

After Mother continued to deny having any information regarding the location of Father or the older children, law enforcement arrested her for impeding an investigation. Law enforcement eventually located Father. Father stated Da.C. was at a football practice and the other two children were with the paternal grandmother at an unknown location. Law enforcement detained Father for child endangerment. DPSS placed Dem. and Da.C. in protective custody, and obtained protective custody warrants as to Dev. and Do.C., however the paternal grandmother and the parents evaded efforts to execute the warrants. (*L.M. I.*, *supra*, E080657.)

The parents had 12 prior child welfare referrals, commencing in March 2013, for allegations relating to physical abuse and general neglect. The referrals were closed as unfounded and/or inclusive or evaluated out. (*L.M. I.*, *supra*, E080657.)

On June 14, 2019, DPSS filed a petition on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (serious physical abuse), (g) (no provision for support), and (j) (abuse of sibling). (*L.M. I.*, *supra*, E080657.)

On June 17, 2019, the parents filed ICWA-020 Parental Notification of Indian Status forms (ICWA-020) indicating that they had no Native American ancestry as far as they knew.

At the June 17, 2019 detention hearing, the juvenile court formally detained the children from parental custody, provided the parents with supervised visitation and

4

predispositional services, and continued the matter for further investigation. (*L.M. I.*, *supra*, E080657.) The parents, two maternal aunts, a maternal uncle, the maternal grandfather, four paternal aunts, the paternal grandparents, several cousins, and others were present at the detention hearing.[5] The court did not inquire of the parents or of any of the relatives present as to the family's Native American ancestry, and found there was no reason to know an Indian child was involved as to Dev., Dem. and L.L.

On June 21, 2019, a forensic medical examination was performed on then two-month-old Dem. by Dr. Sophia Grant. Dr. Grant found a linear abrasion on Dem.'s right upper leg and an erythematous bruise on the right side of his face which was uncommon for his age, and determined Dem. sustained injuries that were concerning for nonaccidental trauma. Dr. Grant also observed Dem. had a lesion on the right tibia which was consistent with an abusive injury. Dem.'s treating physician at the hospital determined that there were concerns of Shaken Baby Syndrome, noting Dem. sustained retinal hemorrhages in both eyes which was highly suspicious for traumatic injury. The doctor further noted that Dem. had signs of old bleeding but no scalp contusions, "'which meant the injury could be due to acceleration/deceleration injury and that shaking was a common mechanism of acceleration/deceleration.'" (*L.M. I.*, *supra*, E080657.)

A July 24, 2019 forensic medical examination of Dem. confirmed he was a victim

---

[5] The record does not indicate whether the paternal grandparents were related to Father or father D.C. (the father of Mother's two older children who are not subjects or parties to this appeal).

5

of trauma including high velocity head injury with acceleration/deceleration and rotational forces to his head. The abusive head trauma was not a singular event and had occurred more than once "'given the chronic nature of the subdurals.'" (*L.M. I.*, *supra*, E080657.) The medical examiner opined Dem. may suffer long term developmental consequence as a result of the trauma. Dem. continued to suffer seizure activity and was classified as a medically fragile child, with possible developmental disability. (*L.M. I.*, *supra*, E080657.)

The parents' supervised visitation with the older children went well. They appropriately played with their boys and comforted them when they were upset. However, there were concerns with Father being too rough with the boys. In July 2019, DPSS provided the parents with referrals for services, and they indicated they would enroll in individual therapy. As of August 2019, the parents were attending parenting classes, but had not provided confirmation of being enrolled in counseling services. (*L.M. I.*, *supra*, E080657.)

The jurisdictional/dispositional hearing was held on October 16, 2019, over the course of nine days. The juvenile court struck the subdivisions (a) and (e) allegations of section 300, and found true the allegations under subdivisions (b) and (j). The court declared the children dependents of the court, provided reunification services to Mother and Father, and family maintenance services to father D.C. (*L.M. I.*, *supra*, E080657.)

On November 4, 2019, the juvenile court found that ICWA did not apply as to Dev. and Dem.

On June 9, 2020, the court placed the children back in the parents' care. (*L.M. I.*, *supra*, E080657.)

At a hearing on December 16, 2020, Mother's counsel informed the juvenile court that Mother had no Native American ancestry, and counsel did not believe that the ICWA applied to either parent. Father's counsel stated that "there is no ICWA."

On December 9, 2020, the court terminated the dependency.[6] (*L.M. I.*, *supra*, E080657.)

B. *Reactivated Petition*

A day after the dependency was terminated, on December 10, 2020, DPSS received a referral that Dem. was admitted to the emergency room as a CT scan showed a new acute subdural hemorrhage. The following day, the social worker confirmed that Dem. was admitted due to acute subdural hemorrhage consistent with Shaken Baby Syndrome. The doctor noted the injury occurred within the last month, and the bleeding was caused by """trauma acceleration and trauma deceleration.""" (*L.M. I.*, *supra*, E080657.) The doctor emphasized that it was """a clear indication of physical abuse to the head.""" (*Ibid.*)

Mother refused to speak with law enforcement and the social worker. However, child abuse specialist Dr. Laura Jacobson stated Mother had informed medical staff that the child had no trauma history, that he was rambunctious and that he hurts himself. Dr. Jacobson noted that absent trauma history, the injuries were consistent with physical

---

[6] Mother's older children were returned to the custody of their father D.C.

abuse to the head. Dr. Jacobson also stated that Mother was attempting to leave the hospital against medical advice. Dev. and Dem. were taken into protective custody. (*L.M. I.*, *supra*, E080657.)

On December 15, 2020, DPSS filed a reactivated petition alleging serious physical harm, severe physical abuse and neglect of Dem. and neglect of Dev. (§ 300, subds. (a), (b), (e), & (j)). (*L.M. I.*, *supra*, E080657.)

On December 16, 2020, DPSS filed an amended petition to include then three-month-old sibling L.L., whom the parents had kept undisclosed to DPSS. On this same day, the juvenile court formally removed the children from the physical custody of the parents. (*L.M. I.*, *supra*, E080657.)

At the continued detention hearing on December 17, 2020, the parents confirmed that they did not have any Native American ancestry. The juvenile court found that DPSS had conducted a sufficient ICWA inquiry and that ICWA did not apply to the proceedings.

On December 28, 2020, the parents denied having any Native American ancestry. DPSS recommended the court find true the allegations in the amended petition, that both parents be denied services pursuant to section 361.5, subdivisions (b)(5) and (b)(6), and that a section 366.26 hearing be set. Dev. exhibited aggressive behaviors in his foster placement. He also disclosed to the foster parent that his parents would hit him in the face and demonstrated it by slapping himself. The children's forensic medical examinations revealed that Dev. and L.L. were determined to have experienced neglect. L.L. had insufficient nutrition and growth, and Dev. had a previous tibia fracture

8

consistent with abusive injury.  A subsequent examination of Dev. showed he had sustained facial bruising and a fractured tibia that were suspicious for physical abuse. Dem.'s forensic examination revealed his injuries were highly suspicious for physical abuse.  (*L.M. I.*, *supra*, E080657.)

DPSS noted that the parents had previously been offered parenting classes, individual counseling and medically fragile training, yet this was the second time Dem. had suffered a """"brain bleed"""" while in his parents care and the parents had failed to provide a credible explanation for Dem.'s injuries.  DPSS was concerned the parents may be physically abusing the children based on prior history, the explanation of how the injury likely occurred from medical professionals, as well as Mother refusing to speak with law enforcement and DPSS.  (*L.M. I.*, *supra*, E080657.)

In February, March and April 2021, DPSS filed second, third and fourth amended petitions, respectively, correcting errors in the prior first amended petition and adding allegations based on Dev.'s tibia fracture and Mother's child welfare history.  (*L.M. I.*, *supra*, E080657.)

Dem. underwent a new MRI in late May 2021.  The results of his new MRI showed """"[s]table extensive bi-lateral cervical micro hemorrhage concerning for acute axonal injury.""""  (*L.M. I.*, *supra*, E080657.)  Dem. was assessed for and it was determined he had no bleeding disease.  Dem.'s addendum forensic medical examination showed that Dr. Grant had specified the medical records she relied on to make her findings, further analyzed the basis for the determination that Dem. was a victim of abusive head trauma, and confirmed her finding of physical abuse.  Dr. Grant also

9

explained Mother's claim that Dem. had Factor V Leidin mutation causing easy bruising was incorrect, as that condition contributes to thrombotic events rather than bleeding or bruising. Dr. Grant also expressed concern """"about the back and forth between bio parents and resource parents."""" (*L.M. I.*, *supra*, E080657.) The doctor explained: """"This type of instability is detrimental to the mental health of this child. Also concerning is the antisocial/aggressive behavior. I recommend trauma counseling and educational/developmental evaluation."""" (*Ibid.*)

In April 2021, the children were placed together with a non-related extended family member, J.C. (a stepmaternal cousin), the same placement the boys had in the prior dependency case. The children appeared to recognize her and walked right into the home and began playing with the toys in the living room. The children were initially shy but quickly assimilated into the home. The children referred to J.C. as "mom."

In May 2021, the parents continued to participate in visitation every Wednesday. Visits were supervised by the paternal grandmother, while the social worker or other staff observed the visits. No concerns were reported or observed.

In December 2021, Dev. acted up during visits, and he stated it was because Mother hit him on the face. Dev. referred to Mother by her first name. Mother corrected Dev. and explained that she was his mother and not J.C., but Dev. disagreed and would become upset. Dev. began to become upset prior to visits and would make statements indicating that he did not want to go to the visit and wanted to stay home and be safe. J.C. never told the children to call her "mom" and allowed them to call her whatever they wanted.

In February 2022, the caregiver reported that she was having great concerns with Dev.'s behavior. He was destroying things in the home, physically hurting his siblings, and appeared to show no remorse after hurting others. His behaviors had been escalating as Dev. began showing a lot of anger before and after visits. Dev. and Dem. were angry and indicated that they did not want to go to visits, and they would yell, scream, and hit each other on the way to visits. Staff also observed these behaviors when they did the exchange for visits. The social worker observed Dev. to be extremely defiant with the parents at a visit. When the social worker asked Dev. if he felt safe with his caretakers, and he said, "'Yes!'" The social worker asked him if he felt safe with the parents, and Dev.'s facial expression changed and he stated, "'No.'" The social worker attempted to find out why, but Dev. indicated he did not know why and would change the subject.

Due to the parents' concern regarding physical abuse in the caregiver's home, the children participated in a forensic examination with Dr. Grant. Dr. Grant reported no concerns as to abuse and neglect by the caregiver. Dr. Grant stated that it appeared the children were well taken care of and indicated the children had been seen by medical professionals several times and believed they were doing "'more harm than good.'" Dr. Grant expressed concern with the extended amount of time the children's case had been open without a decision being made as to a permanent plan, and noted that the children were experiencing issues with their behaviors due to their current situation. Dr. Grant also expressed concern "'about the back and forth between bio parents and resource parents,'" noting "'[t]his type of instability is detrimental to the mental health of this child.'" Dr. Grant further noted concern as to the children's antisocial/aggressive

11

behavior and recommended trauma counseling and educational/developmental evaluation.

DPSS recommended that visitation be reduced to bi-weekly due to concerns with the parents' visitations with the children. The caregiver, J.C., reported "severe concerns" with Dev.'s behavior. When the social worker transported the children to their visit with their parents on February 2, 2022, Dev. and Dem. did not want to visit with their parents. The boys would hit each other in the car, and the social worker had to stop the car on three occasions. Dr. Grant reported that it was evident that the children were experiencing issues and their behaviors were due to their current situation of having the matter open without a decision as to the children's permanent plan.

In September 2022, J.C. reported again having difficulty redirecting Dev. Dev. had consistently made statements of not wanting to participate in visits, and he acted out before and after visits. J.C. was concerned that she had to ignore what Dev. was expressing and take him to visits. She believed this caused further issues with his behavior as Dev. did not feel that she was protecting him or listening to him. At the end of a visit on September 21, 2022, Dev. became very angry and began throwing objects including a small chair at the staff member who supervised the visit.

On September 28, 2022, DPSS's WRAP team expressed concern with Dev.'s behavior and indicated his behavior was connected to visits. The social worker observed the children in J.C.'s home on October 5, 2022, and Dev. was described as being "extremely hyperactive" as he jumped around the home, threw objects, and argued with his siblings. He told the social worker that he did not want to go to his scheduled visit

12

later that day, but was unable to explain why he did not want to go. Dev. was destructive and aggressive. He was aggressive with L.L. and pulled her elbow out of the socket. Dev. also peed all over the children's shoes.

J.C. submitted a 14-day notice of change in placement due to a high risk pregnancy. J.C. had medical complications with her pregnancy and was on bedrest due to the medical issue. She felt she had no choice but to discontinue caring for the children.

On October 19, 2022, Dem. and L.L. were placed together in a foster home while on October 20, 2022, Dev. was placed into a separate home. After being in a new placement, Dev. stated that he did not want to visit the parents and asserted, referring to the parents, "'Loni and Matt tell me I am bad and stupid.'" Dev.s' behaviors escalated since being removed from J.C.'s home and being separated from his siblings. It was reported that Dem. always came home from a visit with a toy, but L.L. did not which made her upset and try to take the toy from Dem.

The contested jurisdictional/dispositional hearing ultimately began on January 9, 2023. DPSS's counsel submitted on the reports, evidence and extensive medical records filed with court, requested the court take judicial notice of the case records dating back to June 14, 2019, and asked the court to make findings pursuant to section 355.1 as requested in its trial brief filed July 19, 2022. DPSS's counsel also requested the court find true the allegations in the fourth amended petition dated April 15, 2021, that the parents be denied services pursuant to section 361.5, subdivisions (b)(3), (b)(5), and (b)(6), and a section 366.26 hearing be set. (*L.M. I.*, *supra*, E080657.)

13

Following testimony from medical experts and social workers who testified on behalf of the parents and medical experts who testified on behalf of the children, on February 3, 2023, the juvenile court found true the allegations in the fourth amended petition, declared the children dependents of the court, denied the parents reunification services pursuant to section 361.5, subdivisions (b)(3), (5), (6), and (7), and set a section 366.26 hearing. (*L.M. I.*, *supra*, E080657.) The court also confirmed at that hearing that it previously found ICWA did not apply to the case.

Mother and Father each filed a timely notice of intent to file a writ petition. On June 9, 2023, we denied the parents' writ petitions. (*L.M. I.*, *supra*, E080657.)

J.C. was in contact with DPSS and indicated that she was willing to take all three children back into her home and provide them with permanency. She recently had given birth and was ready to have the children back in her care.

The children visited the parents twice a month for two hours at DPSS's office. The visits were supervised and were reported to go well. The children interacted well with each other and the parents, and no concerns were noted regarding visitation. The parents brought food and toys at visits, but they only brought toys for the boys. After visits, however, Dev. was anxious, hard to redirect, and participated in self-harm behavior such as hitting himself and pulling his hair. His teacher reported that his behavior improved, but he tended to have inappropriate behavior starting the day before supervised visits through the day after.

On September 7, 2023, the juvenile court authorized an extended visit with Dem. and L.L. with J.C. Dev. was authorized to have one overnight a week in J.C.'s home.

The children referred to J.C. as "'mom.'" On October 18, 2023, Dem. and L.L. were placed with J.C. Dev. was placed with J.C. the next day.

The children called J.C. and her husband "mom" and "dad" and expressed their need to want to live with them in their home. The children appeared to be flourishing in the caregivers' care, who were identified as the prospective adoptive parents. The caregivers had a strong bond with the children, desired to provided them with stability and permanency and "excitedly" anticipated the pending adoption. Dev. reported that he wanted to stay with his caregivers "'forever'" and appeared to be strongly bonded to them. When Dem. was asked about adoption and remaining in the care of his caregiver parents for a long time, he responded, "'yes, I want to stay here,'" and was happy to be with them. L.L. was too young to be interviewed about her perspective on being adopted, but she was observed to be content in her caregivers' home.

On October 5, 2023, the parents' visitation with the children was ordered to be twice a month for one hour.

On November 17, 2023, the parents denied having any Native American ancestry.

At the parents' request, Dr. Wendella Wray, a licensed marriage and family therapist, conducted a bonding study on the children and parents. She interviewed the parents and the children, observed several visits between the parents and the children, and subsequently filed two bonding study reports.

In her first report, Dr. Wray noted that she observed two visits with the family, and one visit with the parents and Dev. She observed the family bonding and enjoying one another and the children experiencing a safe and secure attachment. Dev. identified the

15

parents as his mom and dad. He missed them when he left visits, and he was happy when he stayed with the parents. He loved the parents, and he liked visiting the parents because they loved him. Dem. also liked visiting the parents because they bought him toys and loved him. When L.L. was asked about her family, she always selected her mother, father, and siblings as family. Dr. Wray noted that the family was engaged, and opined that it was more beneficial for children to remain connected to the biological parents that were eager to make them feel safe, loved, and nurtured. Dr. Wray explained that the longer the children were separated from their parents, the more trauma the children would have to recover from and that reunifying with the parents would promote secure attachments and prevent the children from experiencing further trauma.

In her supplemental report, Dr. Wray reported that at the visit on February 28, 2024, the children, upon entering the family resource center, were very excited to see their parents. All three referred to the parents as "mom and dad" whereas in prior sessions they had called the parents by their first name on several occasions. Now that the children were all together again, they demonstrated more confidence and felt self-assured. The children looked forward to meeting with their parents and felt comfortable to see their parents again. At the end of visits, Dev. said he did not want to leave. The children did not show any signs of distress, anxiety, or fear when in the presence of the parents, and the children felt safe and loved and expressed happiness.

Dr. Wray indicated that it "is evident throughout my findings that both parents are really invested in the well-being of their children and have a good understanding of each child and what they need." The parents were committed to maintaining a relationship

16

with all three children and were caring, nurturing human beings. The parents were ready to take on the challenge to support their children in providing them the help that they needed. It was beneficial to the children to stay connected to their biological parents who were eager to make the children feel safe, loved, and nurtured. Dr. Wray concluded that the parents had "demonstrated compassion and healthy attachment bonds when their three children are in their care ([Dev., Dem., and L.L.])." Both parents had also shown "emotional and physical safety and the capability of parenting and nurturing with their children." The attachment bond over time had been consistent and had "developed stronger" since she had visited the family in 2023. The parents had been consistent with visitation and they continued to hope the children could be returned to them.

At a hearing on January 31, 2024, the juvenile court found sufficient ICWA inquiry had been made and that there had been no new information to indicate ICWA may now apply.

A maternal aunt and a maternal cousin were present at a hearing on April 11, 2024. Upon inquiry by the juvenile court, the maternal aunt and adult maternal cousin denied having any Native American ancestry. The court continued to find that ICWA did not apply.

The contested section 366.26 hearing was held on June 4, 2024. At that time, reports and exhibits were entered into evidence, and Mother, Father, the social worker, and Dr. Wray testified. DPSS and the children's counsels requested the juvenile court terminate parental rights and order adoption as the children's permanent plan. The

17

parents argued that parental rights should not be terminated as the parent beneficial relationship exception under section 300, subdivision (c)(1)(B)(i) applied.

In relevant part, Mother testified that she maintained contact with all three children and had been consistently visiting them. She would bring food to visits that the children liked to eat, as well as games and anything the children specifically asked for. The children called her "mom" and were happy to see her. The children called Father "dad." At the end of visits, they would pray and clean up. The children did not want to leave. Mother testified that she was attached to the children and they were attached to her.

Father testified that the parents would bring hot wheels, monster trucks, and coloring books to visits. The children would hug him at visits and call him "father or daddy." He noted that the children became a little sad at the end of visits and that Dev. required a little more attention than the other two children because he was more emotional.

The social worker testified that she had been assigned to the case approximately six months earlier and had observed two visits for short periods of time. Mother was appropriate in her interactions with the children, and did not recall the children stating that they wanted to have more time with Mother and Father. She did not see any hugging occur, but she observed the children to be excited with their toys and the family pray at the end of the visit. In the prior six months, the social worker was not aware of the parents being inappropriate during their contact with the children and noted the parents were consistent with visiting the children.

18

The social worker further testified that the children referred to their prospective adoptive parents as "mom and dad." After visits with the parents, the children returned to the prospective adoptive parents and were affectionate with them by hugging them and showing them the toys they received from the parents. The social worker visited the children on a monthly basis, and the children did not request more visits with the parents and that the visits were adequate. When the social worker had contact with Dev. in May 2024, he referred to the parents using their first names. Dev. stated that he did not want to have any more visits with the parents because the parents lie, but also noted that some of the visits were good.

Dr. Wray testified that she was a licensed marriage and family therapist. In her practice, she primarily focused on parents with young children and couples. She had completed four bonding studies within the past two years and had been asked to do a bonding study as to the three children. She testified consistently with her admitted bonding study reports. Specifically, she noted there was an attachment bond between the children and the parents, that the parents had a parental role in the children's lives, that the children identified the parents as "mom" and "dad" consistently, and that the children looked forward to their visits and time with their parents. Dr. Wray believed that it would be detrimental for the children if the parents were not in their lives at that point. She explained: "The consistency with them always reminding them, which I think is very helpful in reminding them that they are going to be coming back. So the idea of not coming back or ever coming back would be extremely detrimental because they actually look forward to those visits and that time with their parents."

19

Following argument by counsel, the juvenile court found the exception inapplicable. When making its findings, the court took judicial notice of the entire case file and found the parents to be credible. However, the court did not find Dr. Wray to be credible, explaining "with respect to Dr. Wray's testimony and her conclusions, I do find her conclusions to be unreliable and her study is flawed." The court also noted that Dr. Wray had incomplete and incorrect facts she had relied on. The court explained that Dr. Wray did not assess the bond between the children and the parents, "and only really opined about the bond between the parents to the kids."

The court thereafter noted that the parents must show the parental benefit exception by a preponderance of the evidence and the *Caden C.* factors it must consider in finding the exception applicable. After analyzing these factors, the court found that the parents had visited consistently and stated that the "real debate here" was over the second and third prongs. The court noted that the bonding study focused on how the parents loved the children and not the benefit from continuing the relationship. The court opined that the parents did not demonstrate by a preponderance of the evidence that the children would benefit from the continued relationship. The court explained: "As indicated, we have a bonding study provided by the parents. The study focused on how the parents love the kids, not the benefit from the continued relationship. [¶] In fact, if you look at the supplement and look at Page 4 of the supplement, it indicates that the kids don't have a negative emotional reaction when the visit ends. To the contrary, the visits end fine. Moreover, the supplement also goes on to note that the kids are maturing and confident and they have less behavioral issues because they are together. It does not say that it is

20

because of the relationship with the parents. [¶] We know that during this period of time between the first study and the second study, the kids were all placed together and all placed with the caretaker in October of 2023, and that provided a degree of stability that—and when Dr. Wray observed the children again in April and May of 2024, the kids had had that six months of stability. So I don't see that the parents have met even by a preponderance of the evidence that the children would benefit from the continued relationship."

As to the third prong, the court found that there was no evidence to show that there would be a substantial harm that would outweigh the benefits of adoption. The court noted that the relationship between the children and the parents was nothing more than if the children "had a close relationship with another family member or a close family friend." The court found there was no detriment to the children such that it would outweigh the benefits of adoption to the children. The court thereafter found the children adoptable and terminated parental rights. The parents timely appealed.

III.

DISCUSSION

A. *Parental Benefit Exception*

The parents argue the juvenile court erred in finding they failed to establish the parental benefit exception to terminating parental rights did not apply, and assert the order terminating parental rights should be reversed. Mother believes that the only reasonable inference based on the evidence was that the children would suffer detriment

21

by the loss of the relationship with the parents and that the juvenile court relied on improper factors in finding the exception did not apply.

B. *Legal Principles*

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child "who cannot be returned to a parent's care," section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629-630; see § 366.26, subd. (b); *In re A.L.* (2022) 73 Cal.App.5th 1131, 1149.)  If the court finds that the child "is likely to be adopted" and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1); *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A); *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.)

One of those reasons, the parental benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i); *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206 (*L.A.-O.*).)  "The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into

account 'the extent permitted by court orders.'" (*Caden C.*, at p. 632; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 854 (*J.D.*); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The "focus is the child," and "'the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; see *J.D.*, at p. 854.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632; see *In re J.D.*, at p. 854.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Autumn H.*, at p. 575.) The relationship should be that of parent and child and not one of friends. (*Id.* at p. 576.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 317.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . Accordingly,

courts should not look to whether the parent can provide a home for the child." (*Caden C.*, at p. 634; see *Katherine J.*, at p. 317.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, at pp. 633-634; see *Katherine J.*, at p. 317.)

C. *Standards of Review*

A "substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; see *Katherine J.*, *supra*, 75 Cal.App.5th at pp. 317-318; *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . . [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of

24

discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 318; *In re L.A.-O.*, *supra*, 73 Cal.App.5th at p. 206.)

D. *Analysis*

In this case, at the section 366.26 hearing, the juvenile court expressly conducted the analysis under *Caden C.* on the record before finding the exception inapplicable. We find that the juvenile court did not err in finding the parental benefit exception did not apply.

We agree with the juvenile court that the parents established the first prong of consistently visiting the children. However, the parents, who had the burden of proving the applicability of the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 635), did not show the children had a substantial, positive, and emotional attachment to them—the kind of attachment implying that the children would benefit from continuing the relationship. (Compare *D.M.*, *supra*, 71 Cal.App.5th at p. 271 [the father testified that the children wanted to return to him and that the youngest child cried when their visits concluded]; *J.D.*, *supra*, 70 Cal.App.5th at p. 856 [the mother introduced logs of her virtual visits with her son that detailed the depth of their bond].)

At the time of the section 366.26 hearing in June 2024, Dev. was six years old, Dem. was five years old, and L.L. was two years old. They had spent the majority of their young lives in foster care. All three children were detained in December 2020 from the parents, and from that time forward the parents only had supervised visitation. Thus, for three and a half years the children's only contact with the parents was through

supervised visitation. Moreover, L.L. only spent the first few months of her life in the parents' care. While Dev. and Dem. spent more time living with the parents, they were subject to an earlier dependency where they were removed from the parent's care. In the first dependency, Dem. was detained at the age of only one month and Dev. was detained at the age of 14 months. They were in foster care for a year until they were placed back with the parents and again removed from their care about six months later. Hence, Dev., who was six years old at the time of the section 366.26 hearing, spent less than two years in the parents' care and Dem., who was five years old at the time of the hearing, spent less than one year in the parents' care.

While the children were happy to see the parents, hugged them, and often referred to them as "mom" and "dad," they did not cry when the visits ended or have "negative emotional reaction[s]" and did not request more visits with the parents. In fact, a month prior to the section 366.26 hearing, Dev. had informed the social worker that he did not want to have any more visits with the parents. After visits, Dev. was anxious, hard to redirect, and participated in self-harm behavior such as hitting himself and pulling his hair. His teacher reported that his behavior improved evidently due to stability of being in his caregivers' home, but he tended to have inappropriate behavior starting the day before supervised visits through the day after. The evidence showed Dev.'s relationship with his parents, at times, may have been harmful to him. The children also referred to their prospective adoptive parents as "mom" and "dad" and had developed a strong mutual bond with them. Dev. and Dem. reported that they wanted to stay in their care and looked to them for stability and security.

26

The children had spent most of their young lives out of the parents' custody. The children required stability and security for longer periods of time than merely months, something the parents were unable to provide given their abuse and neglect history. Meanwhile, the prospective adoptive parents provided love, care, permanency, stability, and security to the children who were thriving in their home.

Finally, for the third element, the court considers whether the termination of parental rights would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) In determining whether termination would be detrimental, "the question is . . . whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id*. at p. 634.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)

The juvenile court found the evidence did not show that there would be substantial harm to the children that would outweigh the benefits of adoption. The court did not abuse its discretion in making this finding. Nothing in the record suggests the children would be detrimentally affected by having the parents' rights terminated and being adopted by their caregivers. Rather, the record indicates it would be detrimental for the children to be returned to the parents' care as evidenced by the parents' failure to benefit from the services, their repeated physical abuse of the boys, and the children's strong

27

bond with their caregivers and their indications to remain with them.  The children were bonded to their caregivers, who had been providing them with ongoing care and love since very young ages (L.L. since birth), and had strong, positive attachments to them. The children had verbalized their love for their caregivers and the boys stated they wanted to stay with them forever.  Although L.L. was too young to understand adoption, she was observed to be attached to her caregivers.  Indeed, due to their caregivers' commitment, the children were thriving in their home.  The stability, security, and sense of belonging the children felt in their caregivers' home was evidenced by the boys' verbal expression of who they wanted to live with.  The evidence in the record is clear that the children will not suffer any detriment from the termination of parental rights.

Mother's arguments to the contrary ask this court to reweigh the evidence and redetermine credibility issues.  However, "'[i]ssues of fact and credibility are questions for the trial court.'  [Citations.]"  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)  "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'  [Citation.]"  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  The juvenile court did not find Dr. Wray's testimony to be credible.  And while it found the parents' testimony to be credible, this does not mean that the only inference is that the parental benefit exception applied.  Rather, the court did not give much weight to the parents' testimony when making its findings or analyzing the factors articulated in *Caden C.*

Mother reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) is misplaced. There, the child had been removed from her father's custody and placed with her

28

maternal grandparents. (*Id.* at p. 293.) In early visits, the child became upset at the end and wanted to leave with the father. (*Id.* at p. 294.) In the opinion of one social worker, who had observed a later visit, there would be "some detriment" to the child if parental rights were terminated. (*Id*. at p. 295.) An expert carried out a bonding study and concluded that there was "a potential for harm" to the child from terminating the parental relationship. (*Id*. at p. 296.) The trial court nevertheless found that termination would not be detrimental, in part because the grandparents were willing to allow the father to continue to visit the child. (*Id*. at pp. 295-296, 300.) The appellate court held that this was error: "The court recognized that [the child] would benefit from continuing her relationship with [the father] and based its decision to terminate parental rights in part on the grandparents' willingness to allow [the father] to continue to visit [the child]. We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents." (*Id.* at p. 300.)

In summing up, *S.B.* stated: "The record shows [the child] loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that [the child] would be greatly harmed by the loss of her significant, positive relationship with [the father]. [Citation.]" (*S.B.*, *supra*, 164 Cal.App.4th at pp. 300-301.)

Later, however, the court in *In re Jason J.* (2009) 175 Cal.App.4th 922 (*Jason J.*)—the same court that decided *S.B.*—cautioned: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a

29

termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*Jason J.*, at p. 937.)

And in *In re C.F.* (2011) 193 Cal.App.4th 549, the same court stated: "Our effort in *Jason J.* to discourage the improper and inaccurate use of our opinion in *S.B.* has not been successful. Following *Jason J.*, in literally dozens of unpublished opinions various panels of this court and courts in other appellate districts have been required to distinguish *S.B.* on its facts and repeatedly reject the notion a parent can prevent termination of parental rights by merely showing there is some measure of benefit in maintaining parental contact." (*Id.* at p. 558.) "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact. . . . [C]ontact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard. [Citation.]" (*Id.* at pp. 558-559.)

Thus, *S.B.* does not stand for the proposition that evidence of benefit from the relationship is necessarily also evidence of detriment from its termination. Rather, there, the juvenile court was faced with affirmative evidence of detriment, which it ignored for an improper reason. Here, there simply was no such evidence of detriment.

We also reject Mother's contention that the juvenile court considered improper factors in finding the exception in applicable. The record clearly indicates the court was well aware of the three prongs of the parental benefit exception and that reunification was not an issue. Further, the court found that Dr. Wray's bonding study focused on how the

parents love their children and not the benefit from continuing the relationship. The court

pointed out that the bonding study indicated that the children were maturing and

confident, and had less behavioral issues because they were placed together again. The

bonding study did not state that the children's improved behavior was because of the

parents. The court's explanation of its findings do not suggest the court was comparing

attributes of the prospective adoptive parents against the parents as suggested by Mother.

Relying on arguments made by DPSS's and the children's counsels, Mother

impliedly argues the court improperly relied on "parental role" as a factor. However,

there is nothing in the record to suggest the court relied on this factor in finding the

exception inapplicable. Accordingly, we reject Mother's claim.

The juvenile court did not abuse its discretion in finding the parental benefit

exception did not apply.

B. *ICWA*

Father also challenges the order terminating parental rights on the ground that the

juvenile court and DPSS failed to comply with the inquiry requirements of ICWA and

related California law. Father specifically asserts the juvenile court's finding that ICWA

did not apply was based on an inquiry of the parents and two maternal relatives while

many other relatives were available throughout the dependency proceedings and not

questioned as to their Native American ancestry. DPSS concedes the ICWA errors and

acknowledges conditional reversal of the parental rights termination orders is required to

allow for ICWA compliance. We agree DPSS must make a further inquiry and the court

31

erred by terminating parental rights without ensuring DPSS complied with ICWA or without making a further finding concerning ICWA's applicability.

"'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation. [Citations.] Congress enacted ICWA to further the federal policy "'that, where possible, an Indian child should remain in the Indian community . . . .'"'" (*In re A.R.* (2022) 77 Cal.App.5th 197, 203.) To that end, "ICWA notice ensures that an Indian tribe is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see *In re J.C.* (2022) 77 Cal.App.5th 70, 77 (*J.C.*).)

In California, section 224.2 "codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs]." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9.) The statute "creates three distinct duties regarding ICWA in dependency proceedings. First, from [DPSS]'s initial contact with a minor and [their] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. [Citation.] Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then [DPSS] 'shall make *further* inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' [Citation.] Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

"[O]nce a child is placed into the temporary custody of a county welfare department, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.'" (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) Absent contrary law or custom of the Indian child's tribe, the term "extended family member" includes "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"""""The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'" [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know . . . the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence.'"""" (*J.C.*, *supra*, 77 Cal.App.5th at p. 78.) The court must make a determination concerning ICWA's applicability before termination of parental rights even if it previously found ICWA inapplicable. (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

Here, the record on appeal reflects DPSS was aware of many extended family members and had contact with some of them—including paternal aunt J.B., maternal aunts J.O. and N.T., maternal uncle J.T., paternal uncle M.L., the paternal grandmother, paternal cousins D.B. and J.B., the paternal great-grandmother, the paternal great-aunt,

33

the maternal grandfather, and maternal cousin R.V.—but the record does not reflect DPSS made any ICWA inquiries to them. Furthermore, the juvenile court did not make any oral or written ICWA findings at the termination of the parental rights hearing. On this record, we must conclude the court erred, and the challenged orders must be conditionally reversed to allow for ICWA compliance. (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

## IV.

## DISPOSITION

The parental termination orders are conditionally reversed. The matter is remanded to the juvenile court with the following directions: DPSS must file a report demonstrating compliance with its duty of further inquiry under ICWA and sections 224.2 and 224.3. The court must conduct a hearing to determine whether DPSS's investigation satisfied its duties under ICWA. The court may also consider any other ICWA-related issues that may have arisen during this appeal.

On remand, if the juvenile court finds a proper and adequate further inquiry and due diligence have been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), it shall reinstate the termination orders.  If the court concludes ICWA applies, it shall proceed with ICWA and California implementing provisions.  (See 25 U.S.C. § 1912, subd. (a); §§ 224.2, subd. (i)(1); 224.3, 224.4.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:


FIELDS
J.


RAPHAEL
J.